IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHELLIE B. HARRIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-4807 |
| | § | |
| FRESENIUS MEDICAL CARE, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Shellie B. Harris sued her employer, Fresenius Medical Care,[1] and her supervisor,
Nelia Soledad, alleging that they delayed her change from part-time to full-time employment
from March 2003 to July 2003 because of national-origin and race discrimination, and that
they retaliated against her for complaining about such discrimination.  Harris alleged
violations of Title VII, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, and asserted state-
law claims for constructive discharge; intentional infliction of emotional distress; negligent
hiring, supervision, training, and retention; and tortious interference with a prospective
business relationship.  After discovery, Soledad and Fresenius moved for summary judgment
as to all of Harris's claims.  (Docket Entry Nos. 30, 33).[2]  Harris has responded, (Docket
Entry No. 42, 48), and defendants have replied, (Docket Entry Nos. 45, 46).  Harris included

---

[1]The proper name is Bio-Medical Applications of Texas, Inc. d/b/a BMA Southwest
Houston, a/k/a Southwest Houston Dialysis Center.

[2]Fresenius also moved for leave to exceed the 25-page limit in its brief in support of its
summary judgment motion.  (Docket Entry No. 32).  Because Fresenius moves for summary
judgment on all six of Harris's claims, the 32-page length of the brief in support of its summary
judgment motion is warranted.  The motion is granted.

with her response a copy of the entire EEOC file, including the determination letter, and the entirety of four deposition transcripts.  (Docket Entry No. 44).  Fresenius objected to, and Soledad moved to strike, the EEOC file and letter and the complete transcripts.  (Docket Entry No. 47).  Harris responded by opposing the grant of summary judgment and alternatively moving to continue the submission of the summary judgment motion to allow her to take an additional deposition. (Docket Entry No. 48).

Based on the pleadings; the motions, responses, and replies; the parties' submissions; and the applicable law, this court grants in part and denies in part defendants' objections and motions to strike Harris's summary judgment evidence, denies Harris's motion for continuance, and grants Soledad's and Fresenius's motions for summary judgment with the sole exception of the claim that when Soledad gave Harris a negative reference in response to an inquiry from a prospective employer, it was in retaliation for Harris's complaints about discrimination in the delay in her promotion to full-time status.  The parties are ordered to appear for a status conference on August 25, 2006, to set a schedule to resolve the remaining claim.  The reasons for these decisions are explained below.

## I.    Background

Although some of the facts are disputed, much of the evidence is not controverted. Harris, who is African-American, worked as a nephrology technician in Alabama starting in late 1996.  (Docket Entry No. 33, Ex. A at 70, 73).  In 1998, she worked in Atlanta and in 2000 returned to Alabama, where she worked for a Fresenius affiliate as a Patient Care Technician (PCT).  A PCT assists nurses with patient care in dialysis treatments.

2

In March 2002, Harris moved to Houston with her two young sons.  In April 2002, she applied for a full-time PCT position at Fresenius's Southwest Houston Dialysis Center ("Southwest").  (Docket Entry No. 33, Ex. A at 160; Docket Entry No. 33, Ex. E).  On April 8, 2002, the Area Administrator for Fresenius, Teresa Smith, offered Harris a full-time PCT position, which Harris accepted.  (*Id.*).

In May 2002, Harris asked to change from full-time to part-time "per diem" status to have more flexibility to care for one of her sons, who had medical problems.  Fresenius allowed PCTs to work in three categories:  full-time; regular part-time at either 20 to 39 hours each week or less than 20 hours each week; or "per diem."  A per diem PCT does not work a guaranteed or set number of hours.  Instead, per diem PCTs work the hours that are left after the regular full-time and part-time PCTs are scheduled in a given week.  Scheduling PCT and nurse work hours is the responsibility of the Director of Nursing (DON) or Clinic Manager for each clinic.  The DON at Southwest from April to December 2002 was Charlotte Kelly.  During this period, Nelia Soledad, who is Filipino, worked as the Charge Nurse at Southwest.  A Charge Nurse is responsible for overseeing the nurses and PCTs and assigning them to specific patients on a shift, but does not schedule work hours for nurses or PCTs.  (Docket Entry No. 33, Ex. A at 128–42).

Harris worked on a per diem basis from May 13, 2002 until September 5, 2002.  (Docket Entry No. 33, Ex. A at 166–70).  As a per diem employee, Harris worked a very flexible schedule and would on occasion decline work when it was offered.  (*Id.* at 166–67).  She explained in her deposition:

3

> Q.      Did you – were there – was there ever a time when Charlotte Kelly [the clinic manager at the time] called you to see if you could come in and you told her you weren't available?
>
> A.      If my son had a doctor's appointment.
>
> Q.      That would happen –
>
> A.      Yes.
>
> Q.      – that you would tell her you were not available.
>
> A.      Yes. Yes. Yes.  If she really needed me on a day and I couldn't get in, then I just told her I have to take him here or I have this to do.

(Docket Entry No. 33, Ex. A at 166).  In the fall of 2002, Harris told Fresenius that she was

going to take a different job at another clinic.  Harris testified:

> Q.      And at some point in the fall of 2003 – excuse me – fall of 2002, you just stopped working at all?
>
> A.      At some point – in the fall of 2002, I called [Charlotte Kelly] and I told her that I was going to have a second job because we were in the process of trying to purchase a home.  And so I had to go through – in the beginning, you know, when you first started working, I can't think of the word.  I have to go through –
>
>           MS. ALLISON: Orientation.
>
> A.      – orientation with another – with another job; and she said, okay.  She understood.  I said, but if you need me, just call me and the days that I'm not working there, then I can be with you.  It was another clinic that was right down the street from my house.  Not even a mile from my house.

(*Id.* at 167).  Fresenius's records show that on November 25, 2002, Harris's employment

was terminated but that she remained eligible for rehire.  (Docket Entry No. 33, Ex. F).  Her

Employee Profile Form lists "family reasons" as the explanation for the job termination.

4

According to Fresenius, these family reasons made her continually unavailable to take on per diem work. (Docket Entry No. 33 at 3). The form lists Harris's last day worked as September 5, 2002, almost two months before her termination date. (Docket Entry No. 33, Ex. F). Harris asserts that she did not receive notification that her employment at Fresenius was terminated in November 2002 but she does not dispute that the last day she worked for Fresenius in 2002 was in early September. (Docket Entry No. 33, Ex. A at 168–69).

After November 28, 2002, Harris called Kelly, the DON or Clinic Manager at Southwest, and asked if she could return to work in a full-time position. (Docket Entry No. 33, Ex. A at 202–03). Harris testified in her deposition that Kelly promised to give her some hours in December to fill in as people took vacation, and that Kelly could later switch her to full time. (*Id.* at 203). Harris returned to work at Fresenius in December 2002 as a per diem employee. She testified that she "wanted to be full-time employee but someone had to changeover." (*Id.* at 204).

Beginning on December 19, 2002, Kelly was on an extended medical leave. Ruth Allen filled in as the DON at the Fresenius Southwest Clinic. Nelia Soledad continued to work as a Charge Nurse at Southwest, and Teresa Smith continued to work as the Area Administrator for a number of clinics in the area, including Southwest. At some point after January 2003, Soledad became the interim DON at Southwest. Fresenius's records show that Soledad's position changed from being the interim DON to the official DON at the Southwest clinic on March 15, 2003, the date that Kelly's medical leave expired and her employment ended. Soledad's first day of work as the DON was March 17, 2003.

When Harris worked as a per diem employee, Allen prepared the schedules for the nurses and PCTs.  Harris testified that during this period, she received all the hours she wanted to work.  (Docket Entry No. 44, Ex. 3 at 214).  The first full-time PCT opening at Southwest after Harris returned to work in December 2002 became available on March 12, 2003, when an employee abruptly left.  Harris suspected that there had been a full-time position available before then, based on the number of hours that she was able to work when she wanted to do so.  Fresenius submitted summary judgment evidence showing that the first vacancy in full-time PCT positions was created when Darnita Stromile unexpectedly quit on March 12, 2003 and that there were no previous openings.  (Docket Entry No. 33, Ex. J).  Harris testified that the first time she "actually knew there was actually a full-time position for sure was the day that they fired Darnita." (Docket Entry No. 44, Ex. 3 at 205–06).

Harris did not receive the position created by Stromile's March 12, 2003 departure.  Instead, Cosna ("Cherry") Ornopia, a former Southwest PCT who had left to work at a different company, was hired to fill the full-time PCT position on March 14, 2003.  Ornopia began working at Southwest on March 17, 2003.  Harris alleges that Soledad made the decision to put Ornopia, who was Filipino, in the position instead of Harris because of race and national origin discrimination.  Defendants deny that Soledad made or participated in the decision to hire Ornopia at all.

Defendants' summary judgment evidence includes a declaration from Teresa Smith and a deposition from Nelia Soledad.  In her declaration, Smith, the Area Administrator, states that at the end of January or beginning of February 2003, Ornopia contacted her about

6

returning to work at Fresenius as a full-time PCT.  (Docket Entry No. 33, Ex. H).  Ornopia

had been a full-time PCT for Fresenius from April 8, 1998 to July 8, 2002.  Smith forwarded

Ornopia's resume to James Briones, Smith's supervisor, on February 1, 2003.  (*Id.*).  Smith

did not notify either Ruth Allen, who was filling in for Kelly as the DON at the Southwest

clinic, or Soledad, who was the Charge Nurse at the clinic and at some point became the

interim DON, about Ornopia's application.  Smith stated that she made the decision to hire

Ornopia to fill the March 2003 full-time PCT vacancy and that Soledad was not involved.

Smith's declaration states:

> Before leaving Southwest, I made the decision to hire Cosna
> ("Cherry") Ornopia as a Patient Care Technician ("PCT").  Ms.
> Ornopia contacted me some time before February 1, 2003, and
> told me that she wanted to return to work at Southwest as a full-
> time PCT.  I knew Ms. Ornopia from when she previously
> worked as a PCT at Southwest.  Ms. Ornopia also sent me a
> copy of her resume.  I interviewed Ms. Ornopia in January
> 2003, and I decided to hire her for the next available full-time
> PCT position because of her skills and her prior work
> experience and history at Southwest as a PCT.
> . . .
> In my last week of employment with Southwest, which was the
> week of March 10, 2003, a PCT resigned without notice.  I
> spoke to Ms. Ornopia that same day and offered her the full-
> time PCT position that had just become available.  I offered this
> position to Ms. Ornopia because I had promised it to her and I
> knew she was available.

(*Id.* at ¶¶ 3, 5).  Smith testified in her declaration that she, not Nelia Soledad, made the

decision to hire Ornopia,  and that she promised the position to Ornopia before the March

12, 2003 vacancy arose.  Smith testified that she asked Soledad to contact Ornopia to tell her

about the job, to meet with Ornopia, and to complete the paperwork relating to her

employment. Ornopia completed the paperwork on March 14, 2003.

Smith also testified that when she hired Ornopia, she did not know that Harris wanted a full-time position. (*Id.* at ¶¶ 6–7). Harris testified that she told Smith that she was interested in working full-time after Smith had announced that she was leaving Fresenius. Smith did not receive notice that she was being laid off as of March 14, 2003 until February 28, 2003. Smith did not announce that she was leaving Southwest until "[s]ome time after February 28, 2003. (*Id*. at ¶ 3). Harris does not controvert Smith's testimony that Smith did not know of Harris's interest in a full-time PCT position at Southwest when Smith hired Ornopia for a vacancy that unexpectedly arose.

Soledad also testified that Smith was the one who hired Ornopia. Soledad testified that she worked for Fresenius beginning in 1997 until December 2004. She began working at the Southwest clinic as a staff nurse and became a Charge Nurse in 1998. In 2002, Charlotte Kelly was the DON of the Southwest clinic. In December 2002, Allen became the interim DON because Kelly was on medical leave. Allen was doing the work schedule for the clinic PCTs and nurses. In January 2003, Soledad began training and was made the interim DON because Allen had to devote most of her time to a different clinic. As the interim DON, Soledad had some but not all of the duties of a DON. For example, as an interim DON, Soledad could not make hiring decisions. (Docket Entry No. 44, Ex. 2 at 43). When Kelly's medical leave expired on March 15, 2003, Soledad became the DON at the Southwest clinic; because that day was a Saturday, her first official day as DON was March 17, 2003. (Docket Entry No. 33, Ex. B at 120–22).

8

Soledad testified that in March 2003, Teresa Smith was the Assistant Administrator. (Docket Entry No. 44, Ex. 2 at 33).  Soledad testified that Harris had indicated her interest in a full-time position, but there was no vacancy and as interim DON, Soledad did not have authority to hire.  On March 12, 2003, before Soledad became the DON, Teresa Smith told her that she had called Ornopia and hired her for the full-time PCT position in the Southwest clinic that had become vacant.  Smith told Soledad that she had previously promised Ornopia a full-time position.  Soledad was instructed to handle Ornopia's paperwork, which required an interview to complete the employee profile.  Soledad did as Smith instructed.  (*Id.* at 44, 104–05, 110).  Ornopia began orientation on March 17, 2003.  On that same date, Soledad became DON at the Southwest clinic, and Sheryl Bass replaced Smith as the Area Administrator.

As noted, Harris does not controvert Smith's testimony that she did not know Harris wanted a full-time PCT position when Ornopia was hired.  Harris asserts that she made verbal requests to Soledad about her interest in the full-time position but did not put the request in writing until after March 17, 2003.  (Docket Entry No. 44, Ex. 3 at 214; Docket Entry No. 44, Ex. N).  Harris instead disputes that Smith made the decision to hire Ornopia. (Docket Entry No. 44, Ex. 3 at 206–10).  Harris argues that Soledad hired Ornopia because Ornopia was Filipino and Soledad favored Filipino employees.  Harris asserts that Soledad had shown bias toward Filipinos and against blacks.  (Docket Entry No. 33, Ex. A at 177–88).  Harris contends that at the Southwest clinic, while Soledad was Charge Nurse and then DON, Soledad allowed Filipino PCTs to take their lunches first, that Filipino PCTs took

9

longer breaks than were allowed but were not disciplined, that Filipinos were assigned less difficult patients, and that Filipino employees were allowed to speak their native language, in violation of the company's English-only policy. (*Id.*). Harris testified that one Filipino PCT was late or would no-call/no-show but was not disciplined. (*Id.*). Harris testified that in 2002, she complained to Charlotte Kelly about Soledad's favoritism towards Filipino employees. (*Id.*). Kelly testified in her deposition that she had received complaints about Soledad showing favoritism toward her Filipino friends. Kelly testified that she had received complaints from employees of all races, including Filipino, about Soledad giving her friends favorable treatment. (Docket Entry No. 33, Ex. G at 54–59). Kelly counseled Soledad and wrote her up for this conduct. (*Id.*). Kelly testified that Soledad acknowledged that she had a problem reprimanding or correcting her friends, who were Filipinos, and promised to work on the problem. (*Id.*). There is no evidence of similar corrective action after this reprimand.

Harris also cited what she believed were her own superior qualifications over those of Ornopia to support her allegation of a discriminatory failure to promote in March 2003. The summary judgment record showed that when Smith decided to hire Ornopia, Smith did not know of Harris's interest and did not compare the qualifications of the two employees. The summary judgment record also showed that Ornopia and Smith had similar years of experience and that both had been credited with prior service at Fresenius. (Docket Entry No. 44, Exs. I, J).

When Harris learned that Ornopia had been hired, she complained to Soledad, who explained that Smith had made the decision and told Harris to put her request for a full-time

10

PCT position in writing.  (Docket Entry No. 33, Ex. A at 234–35).  Harris made a written request for a full-time position on March 17, 2003, in which she stated that it was her first written request, but her fourth verbal request, "the first being made to Charlotte Kelly over the phone before she left on sick leave."  (Docket Entry No. 44, Ex. N).  There is no indication in the summary judgment record that Kelly related the request to Smith or that there was any vacancy available before Kelly's sick leave began.

Harris also complained to Don Williams, the vice-president for the region that includes Houston, John Cobb, and Sheryl Bass, who replaced Smith as Area Manager at the end of March 2003.  (Docket Entry No. 33, Ex. 3 at 233).  On March 24, 2003, Harris called the Employee Access and Response Line ("EAR Line") and complained that she had been discriminated against when she was not hired for the full-time PCT position.  (Docket Entry No. 33, Ex. L).  Dennis Duthu, a Fresenius Human Resources representative, investigated Harris's complaint.  (Docket Entry No. 33, Ex. M).  He spoke with Soledad, who said that the clinic was at full staff, precluding hiring Harris full-time.  (*Id.*).  Duthu found that Soledad did not know why Ornopia was hired before Harris because Smith had made that decision and Soledad was not involved. (*Id.*).  Harris had complained about one other person who she suspected of receiving a full-time position before her; Soledad explained that this individual, Sonia, was returning from a leave of absence and was not a new hire.  (*Id.*).  Duthu recommended that Soledad consider Harris for future full-time openings. He reported that he had informed Harris that she would be considered for future openings and that Harris was satisfied with the answer and looked forward to becoming full-time.  (*Id.*).      Harris

alleged that, after complaining about not receiving the first available full-time job, she was retaliated against. (Docket Entry No. 42 at 13). Harris alleged that her hours were reduced beginning the two week period from March 31 to April 12, and she was scheduled for work on Saturdays, which conflicted with her religious beliefs. (*Id.*). She alleged that she continued to have her lunch and other breaks scheduled after Filipino employees and that she was assigned more difficult patients than Filipino employees. (*Id.*). Harris applied to work at a different dialysis clinic, allegedly because of her reduced hours, but did not call to schedule an interview for a "couple months." (Docket Entry No. 33, Ex. A at 286–92). Soledad received a call from the clinic about Harris. The caller asked to verify Harris's employment, an inquiry that Soledad directed to the human resources department. The caller also asked about Harris's attendance. Soledad told the caller that there were "occasional times that [Harris] was late coming to the unit" during the period that she worked full-time. (Docket Entry No. 33, Ex. B at 93). Harris alleged that this statement was in retaliation for her complaints and that it interfered with her prospective business relationship with the clinic.

Harris continued to complain that her hours had been reduced. In May 2003, she called Williams's office and talked to Bass, who agreed that she would check the work schedules on a weekly basis. Harris testified that her hours improved after that. (Docket Entry No. 44, Ex. 3 at 257). The evidence also showed that Harris also agreed that part-time PCTs occasionally had to work on Saturdays and that full-time PCTs were required to do so, and that she knew of this requirement when she applied for full-time status. (Docket Entry

No. 44, Ex. A, at 138–39, 175–76, 326–27; Docket Entry No. 33, Ex. H at ¶ 7).

On June 2, 2003, Harris filed a charge of discrimination with the EEOC, alleging race discrimination and retaliation. (Docket Entry No. 33, Ex. O). Harris alleges that on June 30, 2003, a patient asked her about her EEOC filing and whether she had received the hours that she wanted. Harris called Bass and alleged that Soledad improperly told the patient this information.

On July 16, 2003, Fresenius made Harris a full-time PCT. Harris worked in this position until October 3, 2003, when she hurt her back and neck taking care of a patient. (Docket Entry No. 33, Ex A at 57; Docket Entry No. 33, Ex. P). Harris has been on medical leave since then. She continues to receive workers' compensation benefits. (Docket Entry No. 33, Ex. A at 50).

In April 2004, the EEOC issued a determination letter. Harris has submitted that letter, along with as much of the EEOC file as she could obtain, as summary judgment evidence. In the letter, the EEOC found that Soledad had "discretionary hiring authority"; had been counseled about her "tendency to treat Filipino employees preferentially; and that Fresenius applied its "reinstatement policy differently to [Harris] and to Ms. Ornopia in March 2003." (Docket Entry No. 44, Ex. 1 at 1). The EEOC found "reasonable cause to believe" that Fresenius failed to promote Harris to a full-time PCT position because of her race. (*Id.*). Both Fresenius and Soledad object to the consideration of this letter.

The EEOC issued Harris a Notice of Right to Sue in September 2004. Harris timely filed this suit. After discovery, the defendants moved for summary judgment. Each

13

argument they raise, and the responses, is considered below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). The nonmovant must do more than show that there is some metaphysical doubt as to the material facts. *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

## III.   The Race, Color and National Origin Discrimination Claim

Harris alleges race and national origin discrimination in violation of Title VII and 42 U.S.C. § 1981. She alleges that Fresenius promoted Ornopia to a full-time position instead of her, despite Ornopia's inferior seniority, experience, and skills, because she was the same ethnicity as Soledad. (Docket Entry No. 1 at ¶ 8). Harris also alleges discriminatory treatment based on the fact that she was African-American and not Filipino.

### A.   The Applicable Legal Standards

15

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Claims of discrimination brought under Title VII and section 1981 require the same proof. *Thomas v. Staple Cotton Discount Corp.*, No. 05-60444, 2006 WL 1490051, at * 1 (5th Cir. May 24, 2006) (unreported case) (citing *Shackelford v. DeLoitte & Touche, LLP*, 190 F.3d 398, 403–04 n.2 (5th Cir. 1999)); *see also LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th Cir. 1996) ("Claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII."). The inquiry under Title VII is "whether the defendant intentionally discriminated against the plaintiff." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004).

When a plaintiff attempts to prove allegations of discrimination and retaliation through indirect or circumstantial evidence, the claims are considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* approach, the plaintiff has the initial burden of making a *prima facie* showing of race discrimination. *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 881 (5th Cir. 2003). To make a *prima facie* showing of discriminatory failure to promote, Harris must show that: (1) she is a member of a protected class; (2) she sought and was qualified for an available position; (3) she was not selected for that position; and (4) the employer awarded the position to someone outside the protected class. *Medina v. Ramsey Steel Co., Inc.*, 238

16

F.3d 674, 680–81 (5th Cir. 2001); *see also Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004).  A *prima facie* showing of discrimination requires a showing that the plaintiff is a member of the protected class and that members outside the protected class received more favorable treatment.  *O'Neal v. Roadway Express*, No. 05-30648, 2006 WL 1308083, at *2–3 (5th Cir. May 11, 2006); *Okaye v. Univ. of Tex. Houston Health Science Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001).

If a plaintiff makes a *prima facie* showing of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory explanation for its decision.  *See Manning*, 332 F.3d at 881.  If the defendant produces a legitimate reason, the presumption of discrimination raised by the plaintiff's *prima facie* case vanishes.  The plaintiff may still avoid summary judgment if she demonstrates a genuine issue of material fact as to whether the legitimate reasons proffered by the defendant are not its true reasons, but instead are a pretext for discrimination.  *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005).  A plaintiff can also use a modified *McDonnell Douglas* approach if she invokes the mixed-motive alternative.  Under this approach, the plaintiff must still demonstrate a *prima facie* case of discrimination, and the defendant then must articulate a legitimate, nondiscriminatory reason for its challenged employment decision.  If the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative).  *Rachid v. Jack In The Box, Inc*., 376 F.3d 305, 312 (5th Cir. 2004).  This court

analyzes Harris's discrimination claim under both approaches.

### B.      The Summary Judgment Record

The defendants have objected to Harris's submission of the EEOC determination letter and those parts of the EEOC file available to her.  Soledad moves to strike the EEOC file.  (Docket Entry No. 47).  Fresenius also objects to Harris's reliance on the EEOC file, arguing that it is not competent summary judgment evidence.  (Docket Entry No. 45 at 3).

The EEOC determination letter states that, "[b]ased upon the analysis of the evidence obtained during the investigation, the Commission finds that there is reasonable cause to believe the Respondent engaged in unlawful employment action against Charging Party when it failed to promote her to a full-time Patient Care Technician because of her race, Black, violating Title VII of the Civil Rights Act of 1964, as amended.  No other finding has been made."  (Docket Entry No. 44, Ex. 1).

The courts have handled efforts to admit EEOC determination letters in different ways, but recent cases affirm a district court's discretion to admit, exclude, or admit and give slight weight to such documents.  In *Smith v. Universal Servs., Inc.*, 454 F.2d 154, 157 (5th Cir. 1972), the Fifth Circuit held that an EEOC reasonable cause determination, consisting of a summary of the charges, a brief review of the facts developed in its investigation, and findings of probable cause that violations exist, was admissible in a Title VII case.  The holding in *Smith* arose in the context of a bench rather than a jury trial and preceded the adoption of the Federal Rules of Evidence.  A petition for rehearing en banc of *Smith* was denied over the strong dissent of six judges who registered their concern that EEOC

18

reasonable cause determinations have "very questionable probative value" and may be "prejudicial, irrelevant, and unreliable." *Smith*, 454 F.2d at 160 (Dyer, J., dissenting).

The Fifth Circuit affirmed its position in *Smith* in a jury case after the adoption of the Federal Rules of Evidence. "EEOC determinations and findings of fact, although not binding on the trier of fact, are admissible as evidence in civil proceedings as probative of a claim of employment discrimination at issue in the civil proceedings." *McClure v. Mexia Indep. Sch. Dist.*, 750 F.2d 396, 400 (5th Cir. 1985), *quoted in Lindsey v. Prive Corp.*, 161 F.3d 886, 894 (5th Cir. 1998).

In *EEOC v. Ford Motor Co.*, 98 F.3d 1341 (6th Cir. 1996) (unpublished table decision), the Sixth Circuit upheld a district court's practice of refusing to admit an EEOC reasonable cause determination in any trial, bench or jury. The Sixth Circuit noted that EEOC reasonable cause determinations carry "an evidentiary value of practically zero." In *Weems v. Ball Metal & Chem. Div., Inc.*, 753 F.2d 527, 528 n.1 (6th Cir. 1985), the same circuit held that an EEOC reasonable cause determination, "in the sound discretion of the trial court, may be admitted into evidence." The Eighth Circuit has also held that the admissibility of an EEOC reasonable cause determination letter is within the trial court's sound discretion, noting that

> [w]hile EEOC reports may contain information that would be useful to the jury, their probative value may be outweighed by problems that would result from their admission. . . . EEOC determinations are not homogeneous products; they vary greatly in quality and factual detail. The trial judge correctly may perceive a danger of unfair prejudice to the defendant or properly may consider that time spent by the defendant in exposing the weaknesses of the EEOC report would add unduly

> to the length of the trial.  Moreover, the trial judge properly may give weight to the hearsay nature of the EEOC report and to the inability of the defendant to cross-examine the report in the same way that a party can cross-examine an adverse witness.

*Johnson v. Yellow Freight Sys., Inc.*, 734 F.2d 1304, 1309 (8th Cir. 1984).

The Eleventh Circuit has held that whether to admit an EEOC reasonable cause determination report is left to the trial judge's discretion, to be reversed only on a clear showing of abuse.  In *Walker v. Nationsbank of Florida N.A.*, 53 F.3d 1548 (11th Cir. 1995), the court upheld a district court's exclusion of an EEOC reasonable cause determination letter on the ground that admission of the letter would unduly confuse the issues when the EEOC's district office and national office reached conflicting determinations.

The Seventh Circuit has also held that admission of reasonable cause determinations is within the district court's discretion, noting that a "trial judge's concern with fulfilling the legislative command that the discrimination claim be subject to independent judicial determination may enter into the decision as to whether to admit the EEOC report." *Tulloss v. Near N. Montessori Sch., Inc.*, 776 F.2d 150, 152 (7th Cir. 1985) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 n.21 (1974)).  The Fourth Circuit and Third Circuit also leave it to the trial judge's discretion to decide whether an EEOC determination is sufficiently probative to be admissible.  *Walton v. Eaton Corp.*, 563 F.2d 66, 75 (3rd Cir. 1977); *Cox v. Babcock & Wilcox Co.*, 471 F.2d 13, 15 (4th Cir. 1972) (agreeing in dicta with the dissent from the refusal to reconsider *Smith* en banc).

The admissibility of an EEOC reasonable cause determination is governed by Rule 803(8)(C) of the Federal Rules of Evidence.  *McClure*, 750 F.2d at 400.  Under that rule, a

party may contend, and a court may find, that the EEOC reasonable cause or other determination is inadmissible on a showing that "the sources of information or other circumstances indicate lack of trustworthiness." Fifth Circuit precedent clearly allows exclusion of an EEOC determination letter when the sources of information or other circumstances indicate a lack of trustworthiness. *McClure*, 750 F.2d at 400. The Fifth Circuit has also allowed exclusion of an EEOC no-probable-cause determination under Rule 403. *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 201–02 (5th Cir. 1992). In *Cortes*, the EEOC's determination letter contained only a few factual findings and a conclusion that because other employees were treated similarly to the charging party, there was no probable cause to believe that discrimination was present. The Fifth Circuit held that the district court did not abuse its discretion by excluding the determination letter because "unlike the detailed evidentiary statements and findings of fact found by [the Fifth Circuit] to be highly probative, this conclusory determination would unfairly prejudice the appellee's case." *Id.* at 202. The court also held that "[n]one of [the previous] decisions [dealing with EEOC determinations and Rule 403] should be read as leaving district courts without discretion under Rule 403 to exclude such reports if their probative value is substantially outweighed by prejudicial effect or other considerations enumerated in the rule." *Id.*

Most of the cases analyzing the admissibility of EEOC determinations under Rule 403 are in the jury trial context. Several recent opinions address the use of EEOC reports and determinations in a summary judgment context. In these cases, the courts generally treat the EEOC determination as admitted, but find that the letter is so conclusory and lacking support

21

in the summary judgment evidence that it did not create disputed issues of material fact so as to defeat the summary judgment motion.  *See Wright v. Columbia Women & Children's Hosp.*, 34 Fed. Appx. 151(5th Cir. 2005) (affirming summary judgment against the employee despite an EEOC determination letter that found reasonable cause to believe that the employer had unlawfully discriminated, because the letter was conclusory and not supported by the summary judgment evidence);  *Septimus v. Univ. of Houston*, 399 F.3d 601, 610 (5th Cir. 2005) (holding that summary judgment was appropriate when plaintiff failed to set forth sufficient evidence of pretext, despite EEOC's determination letter finding reasonable cause of discrimination); *Simms v. Ok. ex rel. Dep't of Mental Health,* 165 F.3d 1321 (10th Cir. 1999) (a favorable determination letter regarding a claim of race-based failure to promote would not necessarily defeat a motion for summary judgment filed by the employer; "when the independent facts before the district court judge fail to establish a genuine issue of material fact, a favorable EEOC letter of determination does not create one."); *Chavarria v. Despachos Del Notre, Inc.*, 390 F. Supp. 2d 591, 598 (S.D. Tex. 2005) ("If the summary judgment record independent of the letter of determination does not raise an issue of material fact that would prevent the grant of summary judgment, the Court is not persuaded that it should treat a favorable EEOC investigation and letter of determination as creating an issue of fact."); *Bynum v. Fort Worth Indep. Sch. Dist.*, 41 F. Supp. 2d 641, 658 (N.D. Tex. 1999) (when considering what weight to give an EEOC determination at the summary judgment stage, other district courts within this circuit have held that a court should not "deny a summary judgment based on a record that otherwise would require it to be granted simply

because an EEOC investigator has made unfounded determinations of discrimination.").

The EEOC determination letter is admitted and examined in light of all the summary judgment evidence to determine whether it creates a fact issue.  The motion to strike the determination letter is denied.

The pile of other EEOC file materials includes a mixture of letters, some Fresenius documents, and other items.  They contain multiple levels of hearsay; some appear to be business records, others do not, and are not supported by the predicate required under Rule 803(6) of the Federal Rules of Evidence.  Moreover, Harris does not specifically refer to a particular page in the EEOC file materials, other than the determination letter itself. Similarly, she submits entire – and lengthy – deposition transcripts, but she rarely refers to specific pages in those depositions.  "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."  *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003); *see also Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  "'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Malacara*, 353 F.3d at 405 (quoting *Ragas*, 136 F.3d at 458); *see also Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (holding that it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"). "Judges are not like pigs, hunting for truffles buried in briefs."  *De La O v. Housing Auth. of El Paso, Tex.*, 417 F.3d 495, 503 (5th Cir.

2005) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).  This court grants the motion to strike the EEOC file other than the determination letter and the charge of discrimination, and grants the motion to strike the entirety of the deposition transcripts that Harris submitted but did not specifically refer to or cite in her briefs.

Harris also objects to the declaration by Theresa Smith, arguing that it is not properly authenticated, is hearsay, and is contradicted by other evidence.  (Docket Entry No. 42 at 24–25).  An affidavit is proper summary judgment evidence.  FED. R. CIV. P. 56(e).  Unsworn declarations may substitute for an affiant's oath if the statement contained therein is made "under penalty of perjury" and verified as "true and correct."  *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530–31 (5th Cir. 2005); *see also* 28 U.S.C. § 1746.  The last paragraph of Smith's affidavit states, "I declare under penalty of perjury that the foregoing is true and correct." (Docket Entry No. 33, Ex. H at ¶ 8).  Smith testifies about matters within her personal knowledge, specifically her actions as toward Cosna Ornopia.  It is competent summary judgment evidence.  *See DIRECTV*, 420 F.3d at 531.

## IV.    The Failure to Promote Claim[3]

The record shows that Harris is a member of a protected class; was qualified for the full-time PCT position; and that the position was filled by someone outside the protected class in March 2003.  Harris had to wait until July 2003 for a full-time PCT position.

---

[3] To the extent Harris alleged that Soledad was liable under Title VII, this claim cannot proceed.  An individual supervisor is not liable under Title VII. *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 340 (5th Cir. 2003). Harris alleges violations of § 1981, but only as to Fresenius; the race and national original discrimination claims are not asserted against Soledad.  (Docket Entry No. 1 at ¶¶ 9–13).

24

Fresenius argues that, assuming that Harris has shown a *prima facie* case of discrimination, she fails to show that Fresenius's nondiscriminatory reason for hiring Ornopia is pretextual.

Harris testified in her deposition as to the basis for her belief that Soledad was the one who hired Ornopia to fill the unexpected full-time PCT vacancy that arose on March 12, 2003.  First, Harris testified that Ornopia told her that Soledad had told Ornopia that there was a position for her at Fresenius.  (Docket Entry No. 44, Ex. 3 at 206).  Harris does not address the multiple levels of hearsay in Harris's testimony that Ornopia told Harris what Soledad had said to Ornopia.[4]  Even setting that aside, Harris's description of Ornopia's

---

[4]Under the Federal Rules of Evidence, "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c).  As a general rule, "[h]earsay is not admissible except as provided by these rules . . ." FED. R. EVID. 802.  Federal Rule of Evidence 801(d)(2) provides in pertinent part:

> [a] statement is not hearsay . . . if the statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity, or . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

The statement Soledad allegedly made to Ornopia could be a party admission under Federal Rule of Evidence 801(d)(2)(A), as well as a statement by a supervisor about a matter within the scope of her agency under Rule 801(d)(2)(D), and not hearsay.  Harris's testimony about what Ornopia said to her about what Soledad had told Ornopia presents a  "double hearsay" problem.  Under the federal rules, "[h]earsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." FED. R. EVID. 805; *see United States v. Pendas-Martinez*, 845 F.2d 938, 942–43 (11th Cir. 1988) (both levels of hearsay must be excepted from the hearsay rule).  Harris testified that Ornopia told her that Soledad told Ornopia that there was a job available for her at Southwest.  Harris is offering Ornopia's statement to her about what Soledad said to Ornopia for its truth, making it hearsay.  Ornopia's statement to Harris about what Soledad told Ornopia is not within any hearsay exception or exclusion.

25

description of Soledad's statement does not address who at Fresenius made the decision to hire Ornopia. Soledad testified that she worked a second job at another clinic, where Ornopia also worked. Ornopia had told Soledad that she was interested in returning to Fresenius. Soledad testified that when she had that conversation with Ornopia about her interest in a full-time job, Ornopia had already called Theresa Smith, who made the decision to hire Ornopia. (Docket Entry No. 30, Ex. C at 123–25). Harris's first basis for believing that Soledad hired Ornopia does not controvert the summary judgment evidence that Smith made that hiring decision.

Harris's second basis for believing that Soledad, not Smith, made the decision to hire Ornopia was that, in her experience, hiring decisions have "always been the clinic manager's decision." (Docket Entry No. 30, Ex. B at 206). Harris testified that she believed Soledad obtained hiring authority when she took the Clinic Manager, or DON, position. (*Id*. at 319). But Harris also testified that she did not know when Soledad went from interim DON to DON and did not know when Soledad was given hiring authority at the clinic. (*Id*.).[5] This

---

[5]As an additional ground for believing that Soledad, not Smith, hired Ornopia, Harris claims in her reply brief that Soledad admitted in her deposition that "she was the Director of Nursing responsible for the hiring of employees and that Theresa Smith was only her assistant." (Docket Entry No. 42 at 11). This claim is based on the following deposition testimony:

> Q.    Who is Theresa Smith?
>
> A.    She's the Assistant DON in Southwest.
>
> Q.    Was that at the time that you were DON?
>
> A.    Right.
>
> Q.    Theresa Smith was Assistant DON while you were DON?

testimony does not controvert the summary judgment evidence that Soledad did not obtain

hiring authority until she became the DON, which occurred on March 15 or 17, 2003, after

Ornopia had been hired.

Harris argues that Ornopia was less qualified than Harris, but of the same race

(Filipino), as Soledad.  (Docket Entry No. 42 at 17).  The summary judgment evidence shows

that when Smith selected Ornopia for the full-time PCT vacancy, she did not know that

Harris also wanted the job, and did not compare the two.  Even assuming that the decision

maker was choosing between Harris and Ornopia, Harris has not identified summary

judgment evidence that would give rise to a fact issue as to pretext or as to whether

discrimination was one of the motivating factors for the decision.  The summary judgment

evidence does not support an inference that Harris was "'clearly better qualified' than the

employee selected for the position at issue."  *See Celestine v. Petroleos de Venezuella SA*,

266 F.3d 343, 356–57 (5th Cir. 2001); *Manning v. Chevron Chem. Corp.*, 332 F.3d 874, 882

---

A.      Right.  Well, she – there was a change.  I don't know if she was – but when
         she approached me, she was an Assistant DON – not Assistant DON –

Ms. Harris.      Administrator

A.      Like an Assistant Administrator.

Ms. Allison.   Don't answer.

A.      Yeah, the second to the Administrator.

(Docket Entry No. 44, Ex. 2 at  21).  Soledad clearly misspoke when she described Smith, who was
the Area Administrator and one level above the Clinic Manager, or DON, as the Assistant DON.
Elsewhere in her deposition, Soledad made it clear that Smith was the Area Manager.  Harris herself
described Smith as the Area Manager. (Docket Entry No. 44, Ex. 3 at 174).  This argument is
frivolous.

(5th Cir. 2003) (internal citations omitted); *see also Reynolds v. Rumsfeld*, 127 Fed. Appx.
154, 155 (5th Cir. 2005).

"[T]he bar is set high for this kind of evidence because differences in qualifications
are generally not probative evidence of discrimination unless those disparities are 'of such
weight and significance that no reasonable person, in the exercise of impartial judgment,
could have chosen the candidate selected over the plaintiff for the job in question.'"
*Celestine*, 266 F.3d at 357 (*quoting Deines v. Tex. Dept. of Prot. & Regulatory Servs.*, 164
F.3d 277, 280–81 (5th Cir. 1999)).  In a recent opinion, the Supreme Court recognized that
evidence of superior qualifications may establish pretext "in some circumstances."  The
Court noted that several circuits find an inference of pretext only if "the disparity in
qualifications is so apparent as virtually to jump off the page and slap you in the face." *Ash
v. Tyson Foods, Inc.*, --- U.S. ----, ---- - ----, 126 S.Ct. 1195, 1197–98 (2006) (per curiam).
The Court rejected this standard, but declined to "define more precisely what standard should
govern pretext claims based on superior qualifications."  *Id.* at 1198.  The "clearly better
qualified" standard set forth by the Fifth Circuit is not similar to the standard the Court found
faulty in *Ash* and remains binding on this court.  *See, e.g.*, *Celestine*, 266 F.3d at 357;
*Manning*, 332 F.3d at 882.  Courts are not to engage in the practice of second-guessing
employment decisions involving disputes concerning which promotion candidate is more
qualified. *See Scott v. Univ. of Miss.*, 148 F.3d 493, 509 (5th Cir. 1998) (*citing Bienkowski
v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507–08 (5th Cir. 1988)).

"To establish a fact question as to relative qualifications, a plaintiff must provide

28

sufficiently specific reasons for [her] opinion; mere subjective speculation will not suffice." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996).  Harris argues that she had more seniority and experience than Ornopia, but the record shows that both Harris and Ornopia had similar experience before their work for Fresenius and that both had worked for an extended period for Fresenius.  (Docket Entry No. 44, Exs. D, I, J).  Even assuming that Harris had more seniority than Ornopia, the mere fact that one person has worked longer than another does not establish that she is "clearly better qualified" for the position.  *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, (5th Cir. 1996).  Harris has not shown that she was "clearly better qualified" than Ornopia so as to raise a fact issue as to pretext or a prohibited motivating factor.

The summary judgment evidence shows that Teresa Smith had promised the next available full-time PCT position to Ornopia in February 2003, and that Smith made the decision to hire Ornopia without input from Soledad.  (Docket Entry No. 33 at 14).  The record includes a copy of an email in which Smith forwarded Ornopia's resume to her supervisor, James Briones, on February 1, 2003.  (Docket Entry No. 33, Ex. I).  Smith testified that she made the decision to hire Ornopia based on her work experience, skills, and history with Southwest.  (Docket Entry No. 33, Ex. H at ¶ 3).  Smith testified that, at the time she made the decision, she was unaware that Harris was interested in a full-time position and that Soledad did not participate in the decision.  (*Id.* at ¶¶ 6–7).  Soledad testified in her deposition that Smith called Ornopia about the position, and that Soledad's involvement was limited to the new-hire paperwork.  (Docket Entry No. 44, Ex. 2 at 45).  Dennis Duthu, the

29

Human Resources representative who investigated Harris's complaint, found that Smith had made the decision to hire Ornopia.  (Docket Entry No. 33, Ex. M).  Harris does not allege that Smith acted with discriminatory intent.[6]

Harris argues that the evidence of Soledad's reprimand for showing favoritism to Filipino employees creates a fact issue as to her motivation for the choice of Ornopia over Harris for the full-time PCT position in March 2003.  The summary judgment evidence shows that Soledad did not make that decision.  The evidence shows that when Ornopia was hired, Soledad was interim DON and did not have hiring authority.  In July 2003, while Soledad was the DON, another full-time PCT job became available, and Harris received it.

The EEOC determination letter, although part of the summary judgment evidence, does not create a fact issue as to whether defendants' stated reason for hiring Ornopia in March 2003 was a pretext for race discrimination or whether race was a motivating factor in the decision.  The summary judgment evidence does not otherwise support Harris's claims. The evidence shows that the EEOC did not interview any Fresenius employee except Harris.

---

[6]In Harris's "Supplemental Memorandum" in reply to the summary judgment motions, she states, "Plaintiff's [sic] seizes this opportunity to request a continuance so that she may cross-examine Ms. Smith or in the alternative Plaintiff urges the Court to deny Defendants' Motion for Summary Judgment so that Ms. Smith may be cross-examined during trial, which will be a better alternative because this is not a case in which summary judgment should be granted because of the numerous issues raised."  (Docket Entry No. 48 at 8–9).  The discovery deadline in this case was March 31, 2006.  (Docket Entry No. 27).  Harris requested and was allowed an extension of time – until May 30, 2006 – to respond to Fresenius's motion for summary judgment.  (Docket Entry No. 40).  Harris has not identified any reason that she did not depose Smith before the discovery deadline or request a continuance to conduct discovery before the deadline for her summary judgment response.  Nor does she identify a specific need to depose Smith to respond to the summary judgment motion.  The Rule 56(f) requirements are not met and the motion for continuance is denied.

In particular, Soledad, Smith, and Kelly were not interviewed.  The determination letter is conclusory and rests on an incomplete investigation.  As in *Wright* and *Septimus*, such a determination letter is not sufficient to raise a disputed fact issue that defeats summary judgment.  The summary judgment motion is granted as to the failure to promote claim.

**V.    The Claim of Discrimination in the Terms and Conditions of Employment**

Harris also alleges that as Charge Nurse and then DON, Soledad "treated employees that were of the same race, origin, and nationality" as herself preferentially in "work assignments, performance measurements, the work environment, job training, discipline and discharge, and in wages and benefits and that any non-discriminatory reasons were pretextual."  (Docket Entry No. 42 at 10).  Harris cites her own deposition as providing evidence of general discrimination against her.  (*Id.*).  She does not reference a specific page in her deposition or submit excerpts of the deposition to the court – instead she references the entire 367 page document.  (*Id.*).  "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."  *Malacara v. Garber*, 353 F.3d at 405.

Even assuming that Harris's allegations that Soledad scheduled Filipino employees for lunches earlier than other PCTs; did not write up Filipino employees for staying on breaks too long or other infractions; and assigned the non-Filipino PCTs the most challenging patients, are part of the summary judgment evidence – there is no evidence of discriminatory compensation – that evidence does not preclude summary judgment as to discrimination

31

affecting the terms and conditions of employment.  Harris failed to exhaust her administrative remedies as to these allegations.   As a precondition to seeking judicial relief from discriminatory employment practices, complaining employees must exhaust their administrative remedies by filing an administrative charge with the EEOC.  42 U.S.C. § 2000e(5)(b); *see also Pacheco v. Mineta*, 448 F.3d 783, 788 n.6 (5th Cir. 2006).  The Fifth Circuit requires courts to interpret the administrative charge "liberally," but has held that, "at least for the most part, the desired liberality is achieved by application of the rule that courts will look beyond the scope of the charge's language to the scope of the [EEOC] investigation which can reasonably be expected to grow out of the charge." *Pacheco*, 448 F.3d at 788 n.9.

The Fifth Circuit defines the scope of the exhaustion requirement in light of two competing Title VII policies.  On the one hand, because the provisions of Title VII were not designed for the sophisticated, and because most complaints are initiated *pro se*, the scope of an EEOC complaint should be construed liberally.  On the other hand, a primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in attempt to achieve nonjudicial resolution of employment discrimination claims.  Title VII clearly contemplates that no issue will be the subject of a civil action until the EEOC has first had the opportunity to attempt to obtain voluntary compliance.  To balance these objectives, the Fifth Circuit has held that the scope of a complaint must be interpreted not solely by the scope of the administrative charge itself, but by the scope of the EEOC investigation that can reasonably be expected to grow out of the charge of discrimination.  *Pacheco*, 448 F.3d at 788–89 (citations, internal quotation marks, brackets, and emphasis omitted); *see also, e.g.*,

32

*Magana v. Tarrant/Dallas Printing*, 193 F.3d 517, 1999 WL 706122, at *1 (5th Cir.1999) (per curiam) (unpublished opinion) ("We have held, however, that a judicial complaint filed pursuant to Title VII may encompass any kind of discrimination 'like or related to' allegations contained in the EEOC charge, as well as discrimination that grows out of such allegations during the pendency of the case before the Commission.").

In Harris's EEOC charge, she complained only of Fresenius's hiring of Ornopia for the full-time PCT position that became available in March 2003 and, when Harris complained, retaliation in the form of reduced hours and an unfavorable reference to a prospective employer.  (Docket Entry No. 33, Ex. O).  The EEOC limited its investigation and discussion of discrimination against Harris to these charges.  (Docket Entry No. 44, Ex. A).  Harris failed to exhaust her administrative remedies as to alleged discrimination in the terms and conditions of employment, including assigning patients to PCTs, disparate discipline for work rule violations, and scheduling breaks and lunches.  These allegations of discrimination are not sufficiently related to the allegations contained in the EEOC charge or the EEOC investigation that could reasonably be expected to – and did – grow out of her EEOC charge.  *See, e.g.*, *Pacheco*, 448 F.3d at 792 (holding that Title VII plaintiff was not required to check certain box or recite specific incantation to exhaust administrative remedies; instead, plaintiff's administrative charge would be read somewhat broadly, in fact-specific inquiry into what EEOC investigations the charge could reasonably be expected to trigger).  There is no indication that the EEOC investigated the claims of discrimination unrelated to the promotion decision, other than to note the prior reprimand Soledad had

33

received and only in connection with the decision to promote Ornopia instead of Harris in March 2003.  Harris cannot pursue these other discrimination claims in the present case under Title VII.  *See Pacheco*, 448 F.3d at 788–89 (holding that making specific allegations of discrimination does not exhaust administrative remedies for other types of discrimination).

Nor can Harris proceed on the claims of discrimination in the workplace under section 1981 because she has not alleged or presented facts that give rise to a disputed fact issue.  It does not appear that the holdings or reasoning of the Supreme Court's recent decision in *Burlington N. & Santa Fe Ry. Co. v. White*, --- U.S. ----, 2006 WL 1698953, 2006 LEXIS 4895 (June 22, 2006), alters Fifth Circuit precedent concerning discrimination, as opposed to retaliation, jurisprudence.  *See Dixon v. Moore Wallace, Inc.*, 2006 WL 1949501, at *8 (N.D. Tex. July 13, 2006).  In *Burlington*, the Court emphasized that the antidiscrimination provision of Title VII was limited to employment actions that change the terms and conditions of employment.  "The underscored words in the substantive provision–"hire," "discharge," "compensation, terms, conditions, or privileges of employment," "employment opportunities," and "status as an employee"–explicitly limit the scope of that provision to actions that affect employment or alter the conditions of the workplace." *Burlington*, 2006 LEXIS 4895, at *17.  "[A]n employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action" for purposes of a discrimination claim under Title VII.  *Pegram v. Honeywell*, Inc., 361 F.3d 272, 282 (5th Cir. 2004) (addressing Title VII principles as informing § 1981 claim) (quoting *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003)). The effect of an employment

34

action is evaluated according to an objective standard.  *Id.* at 283 (holding that plaintiff's transfer to job "playing a supporting role" to prior job was not adverse employment action); *see also Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir. 1999) (concluding that denial of computer training to plaintiff who only performed related duties occasionally was not adverse employment action); *see also Ryburn v. Potter*, 155 Fed. Appx. 102, 107–08 (5th Cir. 2005) (per curiam) (unpublished opinion) (holding that purely lateral transfer does not constitute adverse employment action).

The discriminatory acts Harris alleges are either insufficiently presented to create a fact issue as to an adverse employment action or, as a matter of law, do not rise to that level. Harris generally asserts disparate discipline, but does not allege that she was disparately disciplined.  Nor does she present evidence that there was disparate discipline among individuals who were "virtually identically situated."  *See Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("To raise an inference of discrimination, the plaintiff may compare his treatment to that of nearly identical, similarly situated individuals."); *Okoye*, 245 F.3d at 514 ("[T]o establish disparate treatment a plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees.") (quotations omitted).  Her allegations that Soledad would schedule lunch breaks for Filipino PCTs first or "sometimes" assign patients who were more difficult to care for to African-American as opposed to Filipino PCTs, and failed to prevent Filipinos from talking to each other in their own language, which was

35

"rude" and against Fresenius's English-only policy, are conclusory and do not allege adverse employment actions that could support a discrimination claim.

The motion for summary judgment is granted as to the claims of discrimination in addition to the delay in promotion.

## VI.   The Retaliation Claim

### A.      The Legal Standard

Title VII makes it an unlawful employment practice for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (1994).  To make a *prima facie* case of retaliation under either Title VII or section 1981, a plaintiff must show that:  "(1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). The *McDonnell Douglas* framework applies to Title VII retaliation claims.  Under that framework, the employee's ultimate burden is to prove that the employer's stated reason for the adverse action was merely a pretext for the real, retaliatory purpose.  If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate rationale for the underlying employment action.  If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment

action was a pretext for retaliation.  *Id.*  The standard of proof on the causation element of a Title VII retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred "but for" her protected conduct.  *Septimus v. Univ. of Houston*, 399 F.3d 601 (5th Cir. 2005);  *Pineda v. United Parcel Serv., Inc*., 360 F.3d 483, 487 (5th Cir. 2004).

In *Burlington*, the Supreme Court held that the antiretaliation provision of Title VII is not limited to discriminatory actions that affect the terms and conditions of employment. 2006 WL 1698953, at *9.  The provision "does not protect an individual from all retaliation, however, but only from retaliation that produces an "injury or harm."  *Id.* at 12–13.  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 13 (quotations omitted).  The standard for harm is objective.  *Id.* at 14.  The harm must be material; Title VII does not protect an employee from trivial harms, "petty slights or minor annoyances that often take place at work and that all employees experience."  *Id.* at 13.  The significance of any given act of retaliation depends upon the particular circumstances of the individual employee.  *Id.* at 14.

### B.    The Summary Judgment Evidence as to Retaliation

Harris alleges that after she complained about perceived discrimination against her, "she was retaliated against, by her hours being cut and bad references given to a prospective employer that called for a reference," and by "scheduling her for work on days Defendant

37

knew would conflict with her religious beliefs."   (Docket Entry No. 1 at ¶ 8(d)).   Harris alleges four types of retaliatory conduct: not scheduling her for enough hours; scheduling her for work on Saturday; Soledad treating Filipino employees better; and Soledad's giving a bad reference about Harris to DaVita.

Harris complained about not receiving as many hours as she wanted to work before she complained that Ornopia receiving the full-time position that she wanted.  Harris testified in her deposition that she complained to Smith about how Soledad scheduled the hours PCTs and nurses worked; Smith left Fresenius before Harris complained about the failure to promote her in March 2003.  (Docket Entry No. 44, Ex. 3 at 200; Docket Entry No. 33, Ex. F).  Harris began seeking additional hours in November of 2002.  (Docket Entry No. 44, Ex. 3 at 2002).  Harris received the hours that she wanted when Allen was doing the scheduling.  (*Id.* at 203–04).  After Harris complained about Ornopia's hiring in March 2003, her hours were reduced.  Harris testified that when that occurred, she complained to Don Williams. He assured Harris that she would have the hours she wanted.  Harris believed that her hours were still too low and called Williams back.  Williams in turn telephoned Bass, who promised to review the schedules Soledad prepared.  (*Id.* at  233–47; 249–51).  Harris testified that after that, her hours did improve.  (*Id.* at 257).  She testified that she "still had to fight for them" and that she felt "intimidated" by Soledad, but she did not identify any shortage in the number of hours she was given.  (*Id.*).

The summary judgment evidence also shows that during this period, Fresenius was overstaffed in the Southwest office and there were not enough hours to give Harris the hours

she wanted.  In an email from Bass to Williams in May 2003, Bass explained that she was

attempting to increase Harris's hours and to move her to full-time employment as soon as

there was a position available, but that the Southwest clinic was "slightly overstaffed."  She

explained

> [W]e are trying to keep everyone until we move patients to Meyerland and can
> reassess our needs for the two clinics.  We are encouraging PCT staff to take
> PTO now while we have the ability to approve time off.  I asked if she were
> willing to take a position at one of the other clinics I manage should a position
> become available.  She indicated she preferred to stay at SW Houston.  I
> assured her I will monitor the schedule, as I have done since she first
> complained, to watch for inequities.  I stressed she should call me first if she
> has a problem and give me the opportunity to resolve the issue locally.  She
> states she will in the future.

(Docket Entry No. 44-10, Ex. B).  On July 16, 2003, Fresenius made Harris a full-time PCT.

(Docket Entry No. 33, Ex. P).

Harris has not raised a fact issue as to whether Fresenius's reason for failing to give

her the hours she wanted – that the hours simply were not available – is pretext.  The

summary judgment evidence that Williams herself presented is that when she complained

about the reduction in her hours, Fresenius promptly investigated and took corrective action.

As a matter of law, the claim of reduction in hours does not give rise to a fact issue as to

retaliation.

Harris testified that she told both Kelly and Smith that she would work on Saturday

if they needed her to, although she would prefer not to do so because of her religious beliefs.

(Docket Entry No. 44, Ex. 3 at 175–76).  Harris testified that she worked Saturdays when

they needed her.  (*Id.* at 326–27).  It is undisputed that full-time employees had to be

available to work Saturdays. (Docket Entry No. 33, Ex. H at ¶ 7). The record shows that Harris wanted more hours in 2003; wanted to work full-time; and was willing to work Saturdays on occasion, both before and after her complaint about not receiving the full-time position she sought and other conditions at Fresenius. She has failed to show a causal connection between the claim of having to work Saturdays and her protected activity.

Harris also testified that Soledad treated Filipino employees better than African-American employees long before Harris complained internally and to the EEOC about the denial of promotion. (Docket Entry No. 33, Ex. A at 177–88). In 2002, Harris complained to Charlotte Kelly about Soledad's favoritism towards Filipino employees. (*Id.*). Kelly testified that she counseled Soledad about showing favoritism towards her friends and that she had received complaints from employees of all races, including Filipino, about Soledad showing favoritism towards her friends. (Docket Entry No. 33, Ex. G at 54–59). In addition to the absence of any evidence of a causal connection between Soledad's alleged favoritism to Filipino employees and Harris's March 2003 complaints of discrimination, much of the disparate treatment Harris alleges does not rise to the *Burlington* standard of retaliation. Scheduling later lunch breaks, not disciplining employees who talked a language other than English among themselves, and assigning certain patients to certain employees, are not materially harmful employment actions that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." 2006 WL 1698953, at *13 (quotations omitted).

Harris also argues that a negative statement Soledad made to a prospective employer

was retaliatory. Harris filled out an application for a second job with another dialysis clinic. A couple months later, she followed up on the application. (Docket Entry No. 33, Ex. A at 286–92). That clinic called Soledad and asked about Harris's employment and attendance. Soledad referred the caller to human resources to verify Harris's employment dates. In response to the caller's specific question, Soledad told the representative that there were "occasional times that [Harris] was late coming to the unit when she was working full-time." (Docket Entry No. 33, Ex. B at 93). The parties dispute whether the statement was true. Harris asserts that this statement was without factual basis and points out that she received no written reprimands for tardiness. Soledad testified that she had orally complained to Kelly that Harris would come in late when Harris was still on full-time status. Harris asserts that Soledad made this statement in retaliation for her complaint about not receiving the full-time position in March 2003 and for inappropriate conduct towards a patient.

Fresenius and Soledad correctly argue that the second complaint cannot form the basis of a retaliation claim because the alleged complaint does not fall within the statute's definition of "protected activity." *Wilson v. Delta State Univ.*, 143 Fed. Appx. 611, 613–14 (5th Cir. 2005) (holding that the practice about which plaintiff complained, that a coworker was unqualified and was hired because of an affair with employer, was not an unlawful practice under Title VII and that opposition to the practice could not support a Title VII retaliation claim). The issue is whether Harris's allegation and the summary judgment evidence that Soledad gave her a negative reference in retaliation for Harris's complaint that she did not receive the March 2003 promotion raise a fact issue as to retaliation.

41

Fresenius and Soledad argue that when the representative from the clinic called, Soledad knew that Harris had complained about the fact that she did not receive the March 2003 promotion, but did not know that Harris had blamed Soledad for discriminating toward Filipinos and against African-American employees.  A *prima facie* case of retaliation under Title VII requires a showing that the decisionmaker was aware of protected activity; otherwise, there can be no causal connection between the protected activity and any adverse employment action taken by that decisionmaker.  *Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999); *see also Corley v. Jackson Police Dep't*, 639 F.2d 1296, 1300 (5th Cir. 1981) ("[A]n employer cannot be guilty of retaliation for an employee's opposition to discrimination unless he is aware of that opposition.").  In this case, the evidence shows that Harris promptly related her dissatisfaction with the fact that Ornopia was hired instead of her, that she blamed Soledad for the decision, and that she attributed racist motives to the decision.  There is a disputed fact issue as to whether Soledad knew that Harris had complained about discrimination when she gave the negative reference.

 The evidence  raises a disputed fact issue that Soledad's statement was in retaliation for Harris's protected activity.  (Docket Entry No. 33 at 20).  The motion for summary judgment is denied as to Harris's claim that when Soledad gave a negative reference to a prospective employer, it was in retaliation for Harris's complaints of discrimination.

## VII.   The Constructive Discharge Claim

Harris argues that Fresenius constructively discharged her by "refusing to hire her to full time despite numerous requests to do so, denied her promotions, increased surveillance

42

of Plaintiff, and gave her unjustified negative evaluations, and unjustified negative references." (Docket Entry No. 42 at 18). Harris argues that, although she did not resign after she was given the full-time job she wanted in July 2003 and before she was injured in October of 2003 and took an extended medical leave, she wanted to leave Fresenius. (Docket Entry No. 1 at ¶ 15).

A constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign. *See Hunt v. Rapides Healthcare Sys.*, 277 F.3d 757, 771–72 (5th Cir. 2001) (citing *Faruki v. Parsons*, 123 F.3d 315, 319 (5th Cir. 1997); *Ward v. Bechtel Corp.*, 102 F.3d 199, 202 (5th Cir. 1997); *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994)). Courts consider a variety of factors, including the following: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer was accepted or not. *Barrow*, 10 F.3d at 297. The test is objective. The question is not whether the plaintiff felt compelled to resign, but whether a reasonable employee in her situation would have felt so compelled. *Id.* at 297 n.19 (citing *McKethan v. Tex. Farm Bureau*, 996 F.2d 734, 740–41 (5th Cir. 1993).

In this case, the evidence is that Harris was not demoted, but promoted to the full-time position she sought, with commensurately increased salary. There is no evidence of harassment, and Harris has not asserted a hostile work environment claim. Not only did she

not resign, the evidence does not raise a fact issue as to whether a reasonable person in her position would have felt compelled to do so.  The motions for summary judgment are granted as to the constructive discharge claim.

## VIII.  The Intentional Infliction of Emotional Distress Claim

Harris alleges a state-law claim of intentional infliction of emotional distress ("IIED"). The elements of an IIED claim are that: "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Hoffman-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004) (citations omitted); *see also Brennan v. Mercedes Benz USA*, 388 F.3d 133, 136 (5th Cir. 2004).  "Extreme and outrageous conduct is conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Hoffman-La Roche*, 144 S.W.3d at 445; *see also Brennan*, 388 F.3d at 136.  The claim does not protect against "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Hoffman-La Roche*, 144 S.W.3d at 445.  There is no litmus test for outrageousness; whether conduct was outrageous and extreme must be analyzed on a case-by-case basis, considering the context and the relationship between the parties. *Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005).  Courts may consider "not just evidence showing the conduct was outrageous, but also evidence showing that, in context, it was not."  *Id.* at 812.  The IIED claim is a "'gap-filler' tort never intended to supplant or duplicate existing statutory or common-law remedies." *Creditwatch*,

44

157 S.W.3d at 816 (holding that availability of statutory remedies for sexual harassment precluded emotional distress claim).

Harris alleges that Soledad inflicted emotional distress on her by failing to provide a work environment free from discrimination, not acceding to her request for a full-time position in March 2003, decreasing her hours, and giving her more difficult patients to care for.  (Docket Entry No. 1 at ¶17).  The summary judgment record does not raise a fact issue as to outrageous conduct by Soledad or Fresenius that would sustain a claim for intentional infliction of emotional distress under the standard set under Texas law.  Summary judgment is granted as to this claim.

## IX.    The Negligent Hiring, Supervision, Training and Retention Claims

Harris alleges that Fresenius did not properly "screen, evaluate, investigate, or take any reasonable steps to determine whether Nelia Soledad was unfit, incompetent, or a danger to third parties."  (Docket Entry No. 1 at ¶ 18).  The Texas Workers' Compensation Act ("TWCA") "provides the exclusive remedy for injuries sustained by an employee in the course of [her] employment as a result of [her] employer's negligence." *See Ward v. Bechtel Corp.*, 102 F.3d 199, 203 (5th Cir. 1997) (holding that plaintiff's sexual harassment claims, characterized in terms of failure to provide a safe workplace, negligent hiring, supervision and retention were precluded by the Workers' Compensation Act's exclusivity provision.). The motions for summary judgment are granted as to Harris's claims of negligence against Fresenius.

## X.    The Tortious Interference with a Business Relationship Claim

45

Under Texas law, the elements of tortious interference with a prospective business relationship are "(1) a reasonable probability that the parties would have entered into a contractual relationship, (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming the plaintiff, (3) the defendant lacked privilege or justification to do the act, and (4) actual harm or damage resulted from the defendant's interference." *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass, Inc.*, 200 F.3d 307, 316 (5th Cir. 2000). A plaintiff must prove that the complained-of conduct was "either independently tortious or unlawful." *Apani Sw., Inc. v. Coca-Cola Enterps., Inc.*, 300 F.3d 620, 635 (5th Cir. 2002) (citing *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001)). To be "independently tortious," the conduct must be actionable under a recognized tort. *Id.*

The summary judgment evidence is that in response to a reference check and a specific question about Harris's attendance from another clinic that Harris had applied to for a second, part-time job, Soledad stated that "there are occasional times that she was late coming to the unit when she was working full-time." (Docket Entry No. 33, Ex. B at 93). Harris does not allege or show that Soledad, in commenting that Harris had occasionally been late when she was working full-time, performed an act that was actionable under a recognized tort. Harris has not alleged or shown that this statement is either independently tortious or unlawful. The motions for summary judgment are granted as to this claim.

## XI.    Conclusion

Defendants' motions for summary judgment are granted except for the claim that

46

when Soledad gave Harris a negative reference to a prospective employer, it was in retaliation for complaining about discrimination in the delay in promoting Harris.  The parties are to appear for a status conference to set a schedule for resolving the sole remaining claim on **August 25, 2006, at 9:00 a.m.**

SIGNED on July 24, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge